and Mr. Ness, are you there on the phone? Yes, I am. And you can hear us? I can hear you fine, yes. And we can hear you fine, so go ahead. Thank you. As stated, my name is David I want to apologize that I am not there. I quite frankly don't know exactly what happened. This wasn't on my calendar, and I apologize for that. In my briefs, I raised four arguments, one having to do with the search warrants for the truck in Mr. Jaeger's home, the second the last two are both sentencing issues, one having to do with the drug quantity calculation, and the other having to do with the reasonableness of his sentence. I think first I'd like to just briefly comment on the issue having to do with the testimony of Mr. Jaeger's wife. As the court is aware, Mr. Jaeger called his wife as a witness. The court, after about three or four questions, became concerned that she might further inculpate herself, increasing her sentence perhaps, or exposing herself to other charges. She had pled guilty and was awaiting sentencing. The court broke into the direct examination. After finding out that she had spoken with her lawyer and obtained his advice with respect to her decision to testify, nevertheless suggested to her that she consult her lawyer again. Recessed, she did do that and then refused to testify and relied upon her Fifth Amendment rights. The court informed the jury of what was going on. My concern with this course of events is two things. One, it prevented Mr. Jaeger from presenting what was perhaps exculpatory testimony on his behalf. There was not, I think it's fair to say, an objection from the jury, nor was there an offer of proof, but Mr. Jaeger's wife was to testify essentially having to do with his lack of involvement, I guess, with the charged conspiracy and his lack of involvement with large quantities of drugs. I think that when the wife was allowed to take the Fifth Amendment and the jury was informed of that, that it was prejudicial to Mr. Jaeger's defense. Judge Graber, let me ask you a question about the standard that we are to apply to this claim. As I understand the Supreme Court's web case, and we had one called something like Viveges, or I'm not pronouncing it correctly, but it's been some ten years ago, it seems to be a standard along the lines that really the witness has to have been essentially driven off the stand, not merely advised in a cautionary sort of way. Do you agree or disagree with that characterization? What do you think the test is for what the trial court does before there is a constitutional error, an interference with due process? Well, I think the court's probably, how would I say it, there certainly is an issue, I think, on how strong the court's admonishment has to be and whether or not the witness has to be driven off the stand, so to speak. I think that while that may in general be true, if you look at all of the circumstances surrounding this case, in particular the fact that this woman was awaiting sentencing before this very same district court judge, that an admonishment from that judge in this fashion, I think quite frankly would put the fear of God in anyone, and that given, you may want to say that the power differential there in the courtroom, that it did in effect drive her off of the stand, and that's not to suggest that the court was unduly harsh with her or that the court wasn't sincerely concerned for her well-being. I guess my greater concern is that this was Mr. Yeager's trial, and it was his right to present a defense, and that when the very same district court judge that's going to be sentencing the witness raises these kinds of concerns, that it will in effect drive the witness off the stand. Counsel, what should the court have done under these circumstances, knowing that the defendant's wife was going to come up for sentencing and that she might say things that could aggravate the punishment that he would have to administer? Why don't we commend the judge for protecting her rights? Well, I think once the judge found out that she had consulted with her lawyer and received her lawyer's advice, and the lawyer had presumably told her that it would be okay to go testify, that that quite honestly should have ended the matter. What's troubling to me, though, is that the lawyer wasn't there so that the judge could have assured himself, with the lawyer there, that that was in fact what he had advised and that his client was going along with it. And I guess the only thing I would say in response to that is that when the client says, yes, I spoke to my lawyer about that, that that should be enough assurance to allow her to go ahead and testify. You know, I think this district court judge was certainly walking a thin line here. And like I say, I think he was sincerely concerned. But the fact of the matter is that we're dealing at this point really with Mr. Yager's constitutional right to present a defense. And if district court judges become too involved in these sorts of circumstances, then bending over backwards, so to speak, to ensure that the witness's rights are protected after it knows the witness hasn't consulted with their lawyer, that you run the risk of harming the defense. You still have about seven minutes. Would you like to reserve some time for rebuttal? I guess I will just say one other thing with regard to the sentencing issue. Sure. Mr. Yager was sentenced to the low end of the guideline range of 324 months. One of the striking things about the sentencing hearing was that the district court judge I think very forthrightly acknowledged that 324 months was probably just as effective in assuring the goals of federal sentencing were met as a lower sentence of 240 months. And that, I believe, goes to the overall reasonableness of the sentence. As the court's aware, under Section 3553A, a federal sentence is required to be sufficient, but not greater than necessary to meet those goals of sentencing. Here we have the district court judge saying that a sentence of 240 months rather than 324 months was sufficient. So I would suggest that as the district court acknowledged that a reasonable sentence would be no greater than 240 months in this case rather than the 324 months that the district court imposed. But the court was aware of its authority to impose less than 324. Yes, the court was. The court was aware of its authority and discretion under Booker. I would acknowledge that. Anything else you'd like to add before we reserve your remaining time? No, Your Honor. That's all. Thank you. Okay. You'll have about six minutes of rebuttal left. Okay. Thank you. And we'll hear now from the government. Good morning. May it please the Court. Mr. Ness, I am Josh Van De Wettering, appearing on behalf of the United States in this case. And thank you for your willingness to be accommodating. It is my pleasure, Your Honor. And I will start also then with the issue of Mr. Yeager's wife testifying. And counsel has characterized that in his brief as the court driving or preventing Mrs. Yeager from testifying. And I don't think that's borne out in the record at all. I think this Court's decision in, and I'm not going to do any better in the pronunciation of Vegas, as well as the Supreme Court's decision in Webb, I think, instructs that it is a balance that the district court has to strike. In fact, this Court in Vegas, I think, said that it is prudent on some level to admonish a witness about her rights and to be careful about that very thing. And I think the record here shows that the district court should, in fact, be commended. There's really only one sentence that the district court offers, which is, I need to admonish you that there may be things that are elicited from you that may impact you personally if you testify here. And I'm on page 185 of the excerpts of record. After that one sentence, the court goes on to say, if you want to have your lawyer here, we'll have it. And the witness then, Mrs. Yeager, starts to question what the court means. She says, okay, I'm not sure what you meant by that first part, though. In other words, she clearly has not reached any kind of firm decision that she wants to come testify. She clearly has not fully considered all her rights. The district court judge does exactly the right thing, remains neutral, does not offer legal advice, but stops the proceeding in order that she can get a hold of her lawyer. I think that's exactly the kind of balancing the web that the Vegas expect of a district court, and the district court has done it well here. We recessed. She had a chance to contact her lawyer. When we came back into court then, or actually before we came back into court with the jury present, the court was notified that she had concluded that she would take the fifth. And, of course, defense counsel didn't try to put her up then because that would be a violation. So after she had that chance to talk to her lawyer, nothing from the judge. The judge isn't forcing her from the stand. She had a chance to confer with her own lawyer and then decided to exercise her own rights. So I think this is very different from the Webb case or the Vegas case, where, of course, the Vegas involved a prosecutor sort of berating the witness. Pre-trial, Webb involved a court repeatedly admonishing a witness. In fact, the court, I think in Webb, said that the court would personally see to it that the witness was charged with perjury if that witness took the stand and told a lie. That's 100 miles from what's happening in this case. Here the court has been very cautious and very appropriate and prudent, to quote the Vegas, in its actions of warning the witness. With respect to the court's decision in sentencing, I think, again, the court has done a very clear and good job of sentencing Mr. Yeager. The court certainly acknowledged that, and I think this is reflected in all of the cases or a number of the cases since Booker, that a reasonable sentence can easily fall within a range. Different sentences can be both or multiple sentences can be considered reasonable in a certain case. Here Mr. Yeager is one of the big players in the conspiracy. He's the first guy who sort of sets it up. He passes it on later to Mr. Hoskins. Mr. Hoskins, in fact, got greater time, 30 years, than Mr. Yeager did. They're very much in the same position. Mr. Yeager got 27 years. The court acknowledged, I think, that that was a comparison and that Mr. Yeager fits right into that range. Even though the court acknowledged that 240 could also be reasonable, I don't think the record reflects that the court said it's the uppermost or the top end of what a reasonable sentence could be. The court here went through the 3553A factors and concluded that Mr. Yeager's sentence was completely reasonable under that standard and, well knowing that it could have gone below 324, concluded that 324 was the appropriate sentence. With respect to the other issues in the case, I think it's very clear that there was more than sufficient evidence to convict the defendant here, that the drug amount was well supported both in terms of monetary evidence of how much money passed through bank accounts as well as through the testimony of witnesses how much they saw. And with respect to the search in this case, I think that's very clearly supported also. Mr. Yeager was driving around with someone law enforcement knew to be an illegal alien who flat out told law enforcement that he was living with Mr. Yeager, so the search of the vehicle was appropriate. And, of course, law enforcement searched the house premised on a little bit of evidence found in the vehicle but probably more importantly the fact that they had Mr. Yeager's own voice on a wire admitting that he was selling drugs but just didn't have any right then. So I think all of that well supports the search unless the panel has other questions. Thank you. Counsel, could you address the argument that there was insufficient evidence of an agreement among the conspirators? Certainly, Your Honor, and thank you. And I would start there by saying the testimony of Christy Staudenmeier, she's the witness who actually watches Mr. Sandoval Sepulveda, Mr. Yeager, and Mr. Hoskins get together and have an agreement where Mr. Yeager is going to stop selling drugs, Mr. Hoskins is going to pay off the rest of his debt to Mr. Sandoval Sepulveda, and Mr. Sandoval Sepulveda will now deal with Mr. Hoskins. That piece of evidence alone I think is sufficient to sustain the conviction for conspiracy in that case. And as we pointed out in our brief, and that's in a sentence the end of a conspiracy, the opposite side for Mr. Yeager, but he can't be agreeing to get out of a conspiracy if he hadn't already at some point agreed to get in. Defense counsel made a point of asking the witnesses whether or not they expressly agreed to be part of the conspiracy. What's your response to that line of questioning? Well, my response, Your Honor, is that they didn't expressly agree. I don't dispute that at all. But it's clear, I think, from the law in this circuit and other circuits as well, that there doesn't have to be an express agreement for there can be a conspiracy. An agreement can be implicit. And we've cited United States versus Hubbard in our brief for that proposition. And I think this drug conspiracy, like most, don't involve people sitting down and having an agreement. I think, in fact, the agreement where Hoskins takes over is highly unusual in its explicitness. But implicit agreements happen in drug conspiracies all the time, and this Court has upheld them. So I would say it's implicit, and that's clear in the evidence. So your argument, the very act of their having the drug trade and cooperating in that as an implicit agreement, is that your? Well, I guess I have multiple arguments. One is that Christy Staudenmeier's testimony about this agreement to stop having a conspiracy is implicit evidence that there was a conspiracy. But then we have the testimony of several other people, too. Arthur Halls, for instance, is one of the people who distributes methamphetamine, who acknowledges that they don't do a direct sale. They come back later on to collect money. And I think that also suggests implicitly that there's an agreement going on. And several other people. Caldwell and Hoffman also, I think, support the idea that there was some preexisting arrangement to split the proceeds. That's exactly right, Your Honor. So I guess my argument is you could take just Christy Staudenmeier's statement, and that would be sufficient to overcome the Rule 29 issue. But there's a whole lot more also, all those other witnesses. You throw them all in a heap, I think we're easily over that hump of whether or not there's sufficient evidence. I have a question, counsel. And this goes to the exercise by the witness of her rights under the Fifth Amendment. After she indicated that she would exercise those rights, the counsel did not ask her any questions. Right. Is it your position that that issue is still properly before us? Even though he didn't ask any questions that might be incriminating? You mean with respect to that, with respect to the last question, whether or not it was an error to not allow her to go on and testify at that point? My question really is, is the issue properly before us? Are you challenging that? I have suggested in my briefing, Your Honor, that it's a plain error standard because it's not preserved below. All right. Is it error? There's no error, no. No. Is it error since the lawyer did not ask any questions that were incriminating? That's all I'm asking you. In other words, must there be a response by the witness, I exercise my rights under the Fifth Amendment to that question? I don't think there needs to be, Your Honor. That was represented by her attorney. All right. Unless there are other questions, then. I don't believe there are. Thank you. And, Mr. Ness, you have almost six minutes left on what to you is an invisible clock here. I didn't hear the last part, Your Honor. I said, I'm sorry, you have almost six minutes on what we can see but to you is an invisible clock. Oh, okay. Okay. I don't think I'll take six minutes, Your Honor. In response to the last question that was just asked to Mr. Vandewettering, I do think that the issue surrounding Mr. Yeager's wife is properly before the court, although the government may be right that the review should be for plain error. Clearly, the witness was placed on the stand, and then she indicated that she was going to take the Fifth Amendment. And so I think the issue is there, but there was no objection by defense counsel, by trial counsel. This is Judge Alarcon. Did you find any authority to support that position, that there need be no question presented once it's clear that the witness is going to exercise his or her Fifth Amendment rights? I didn't, Your Honor, and quite honestly, I don't think that I have. I know that there is state authority in some states that there has to be a question, and there's state authority in other states that there doesn't have to be when it's clear that the witness will not testify. Right, right. And certainly, I think to put the witness on in front of the jury and have her take Fifth Amendment right would have been improper. And the court, as well as all counsel, were informed that she was going to take her Fifth Amendment right. So I think to place her on in front of the judge to have her do that would be somewhat pro forma. So I do think that... It could also be very prejudicial. Right, right, right. Counsel, this is Judge Rawlinson. Yes. Do you still maintain that there was insufficient evidence of an agreement among the conspirators? I do, Your Honor. I would, I guess, rest upon the arguments in my brief. The witnesses were all asked, was there an agreement? And I acknowledge that the government is correct in its statement that there doesn't have to be an explicit agreement, that the agreements can be implicit. But nevertheless, the conspirators do have to reach an overall agreement for the same objective. And there can be more than one agreement going on which could connote more than one conspiracy. And there does have to be evidence that everyone agreed to accomplish the objectives of a single conspiracy. And here, given the witnesses' testimony that they didn't agree that they may have had buy-sell relationships with Mr. Yaeger, I would suggest is not enough to carry the day to establish that he was guilty of this conspiracy. Unless there are any further questions, I think I will rest. I don't believe there are any further questions. Thank you.
judges: Alarcon, Graber, Rawlinson